## OTTENHEIMER BROTHERS Manufacturing Co. *v.* Viva CASEY

5-4273                                              419 S. W. 2d 784

Opinion delivered October 16, 1967
[Rehearing denied November 20, 1967.]

*C. Richard Crockett,* for appellant.

*George Pike, Jr.,* for appellee.

Carleton Harris, Chief Justice. This is a Workmen's Compensation case. Appellee, Viva Casey, was employed by Ottenheimer Brothers Manufacturing Company, appellant herein, in its plant located in Little Rock. Mrs. Casey's job was to hand pleat skirts, set collars, run a pinking machine, and put tape on dresses manufactured by the company. Appellee's wages averaged about $57.90 per week, and her working hours were 7:30 A.M. to 4:00 P.M., five days per week, with morning and afternoon breaks of ten minutes each, and thirty minutes for lunch. On the night of May 6, 1965, Mrs. Casey became ill with what she described as "gas pains," a hurting in the upper part of her stomach and chest. She stated upon awakening next morning, she did not feel good, but had no pains. She went on to work, but began to feel worse, and about 8:30 or

8:45, after lifting a heavy bundle, she felt a pain in her chest. She endeavored to continue work until about 9:30, when she was forced to stop. Mrs. Casey stated that the pain "left my chest, and went up into my arm and shoulder and it seeemd like it would run down my arm and it was just as if you had cut it off." She went to the first aid room and rested for a while. When the lunch hour arrived, appellee was unable to eat, and a fellow employee took her home. That afternoon, she went to the office of Dr. E. J. Ritchie, and subsequently (on October 8, 1965) was examined by Dr. Alfred Kahn, Jr.; also, Drs. Ben Price and James Wilson, cardiologists, made an examination on July 12, 1965. In the meantime, on Monday, May 10, Mrs. Casey returned to work, and worked through Thursday, May 13; while at home that night, she suffered another attack, and has not worked since that time. Another attack was also suffered in June. Appellee filed a claim for compensation benefits, and the matter was heard by a referee. At the conclusion of the hearing, an award was made, but on appeal to the full commission, same was denied. This action of the commission was appealed to the circuit court, which reversed the commission. From the judgment so entered, appellant brings this appeal.

Here, of course, under our well established rule in compensation cases, we are only concerned with whether there was substantial evidence to support the findings of the commission. Mrs. Casey, in testifying, described her duties, part of which consisted of holding a dress up while she guided it through the sewing machine. She stated that holding her hand up, during a day's time, became very tiresome; that she lifted bundles during the day ranging from something less than 20 pounds up to 25 pounds; she had started work for Ottenheimer's in February, 1963, and had lost weight from 189 pounds to 157 during the period of her employment. Mrs. Casey insisted that the pains that she experienced on the night of May 6 were not similar to the one she experienced at work on May 7, and she also stated that she was not in pain when she went to work on the latter date.

Eldon Casey, husband of appellant, said that his wife would complain of being completely exhausted when she returned from work, and would mention a "heaviness in her chest." He stated that she mentioned hurting in her chest on the night of May 6, but that she went to work the next day, though complaining.

Dr. Ritchie testified by deposition on January 11, 1966, that he had been treating Mrs. Casey since May 7, 1965, and last saw her on December 10 of that year. He stated that on May 7, he found she had an attack of angina pectoris, and he gave her an injection of opiate (Demerol) for relief; subsequently, an electrocardiogram was done, which revealed coronary insufficiency. The doctor testified that Mrs. Casey's difficulty was due to arteriosclerotic heart disease, which results in coronary insufficiency; that this condition, from time to time, causes angina pectoris; however, he stated that there was no evidence of a thrombosis or infarction. The witness said that arteriosclerosis is a progressive disease, and it was his opinion that the work claimant was doing on May 7, though having nothing to do with the coronary insufficiency, did contribute to the angina attack which occurred on that date, *i.e.*, the work did contribute to the pain that was suffered by appellee on that particular occasion.[1] He stated that she also, on May 21, came into his office complaining of pain, and upon inquiry, Mrs. Casey said that she had been hurting most of the day, though she had been doing her normal house work on that occasion. The doctor testified that she continued to have anginal pain nearly every day after the 21st. He stated that only the attack of pain which occurred on May 7 could be attributed to the work itself, but that her other attacks of pain were also due to her coronary insufficiency, the pain being occasioned by whatever she happened to be doing at the time. The

---

[1] It might be here stated that the medical evidence in this case points out that angina pectoris is not, in itself, a disease, or condition, but only a symptom of coronary insufficiency. Angina pectoris is sometimes a forerunner of coronary thrombosis.

cardiograph done by the doctor revealed no damage to the heart, and Dr. Ritchie sent Mrs. Casey to Drs. Wilson and Price, who examined her for heart trouble. They made a second cardiogram, and this was compared with the one done by Dr. Ritchie. Both were negative, *i. e.,* there was no evidence of heart damage. It was the view of Ritchie that the work contributed to the attack on May 7, but he could not say that the work at the Ottenheimer Brothers plant caused the condition from which he found her suffering on December 10, 1965; he did state that he thought it might have contributed some to the attacks that she had. The testimony of Dr. Ritchie is the only evidence in the record which supports, in any measure, the view taken by claimant.

Dr. Kahn likewise testified that Mrs. Casey's condition was due to coronary insufficiency, and he explained that this disease is an aging of the arteries. He stated that the aging process does not have any relation to the work the patient might be doing; in fact, the doctor said that physical activity (if controlled) is one of the few things that tend to retard the onset of coronary artery disease. As to the attack on May 7, the witness testified:

"* * * I think the most that one could say is that it's conceivable that something that she did at work might precipitate the pain, which is just a symptom of the underlying disease, but I don't think I could prove, if I tried to, that any important damage had been done to her, or in fact any detectable objective damage."

He said that the pain was only a manifestation of coronary insufficiency and did not represent any physical damage to the heart:

"Well, we ran an electrocardiogram on this patient when she was completely at rest. Then she was given a specified amount of exercise, which was in relationship to her age and build. Then portions of the electrocardio-

graph were repeated. These tracings did not show evidence of—we call it anoxia, in the electrocardiograph. In other words, they were normal after exercise and before.

> Q. Did you find any evidence of heart disease from the electrocardiograph?
>
> A. No.
>
> Q. All right. Did you find any evidence of a blood clot or infarction of the heart muscles?
>
> A. No, sir, I did not."[2]

In answer to the question as to whether it was at all possible that the exercise which she performed on May 7 had contributed to her present condition, Dr. Kahn replied that there are no "absolutes" in medicine, but that he certainly didn't think that the 25 pound lifting was related to her present condition; he was rather emphatic in stating that it was his opinion that her activities did not speed up the degenerative disorder in her coronary arteries, and accordingly he did not think that the angina attacks, which Mrs. Casey had after she quit work, had any causal relation with the exertion of May 7. He also said that excessive fatigue is not good for a person, but that it could not relate to a progression of her disease.

Respondent's Exhibit "A" to the testimony of Dr. Ritchie was a letter from Dr. Wilson to Ritchie. In the letter, Dr. Wilson states that he is "not absolutely convinced she has arteriosclerotic heart disease with coronary insufficiency, but there are enough predisposing

---

[2]Dr. Ritchie commented on a Master's test as one "where they put these people through the mill, hops, jumps, up and down stairs, just a terrific amount of severe exercise, * * * then they do a cardiogram." He was then asked: "Now, if the patient has heart disease, coronary insufficiency or something like that or an infarct or a thrombosis, it will show up on that cardiogram, would it not?" A. "That's right and they might show up dead too."

214

factors and her symptoms suggest angina strongly enough that I think the safest thing is to assume she has coronary disease until we can prove differently.'' One item in the letter is of particular interest. After stating that Mrs. Casey came to the office for evaluation of her recent illness, Dr. Wilson wrote:

"As you know she thought she was in pretty good health until May 6, 1965, when she had a retroeternal chest pain accompanied by aching in her left arm. This occurred about 9:30 at night after she had retired and following a supper which included some fried foods. The pain never did really subside, and after she went to work the next day it became much worse.''

Mrs. Casey denied that she told Dr. Wilson that the pain never did subside. She said she could not understand why Wilson placed that in his report. Of course, since the doctor was not acquainted with appellee until she went to his office, it is difficult to understand how he obtained that information unless she told him, and it would appear that Mrs. Casey has overlooked, or forgotten, that she gave this information. It will be remembered that her husband also stated that she was still complaining on the morning of May 7 when she was getting ready to go to work.

Appellee relies somewhat upon our recent case of *Dougan* v. *Booker*, 241 Ark. 224, 407 S. W. 2d 369, but there are some distinctions in that case.[3] There, a worker with a bad heart put forth unusual exertion in his work, collapsed on the job, and died. The family physician, who had known Dougan for a long period of time, testified in the case in support of the widow's claim, and this doctor was the only doctor who personally had seen and examined Dougan. The other two doctors who testified only reviewed the transcript of the testimony, and from a reading of that testimony, answered a detailed hypothetical question, one of the doctors express-

[3]Other cases cited are not applicable to the facts herein.

ing the opinion that Dougan's work did not contribute to his death. The claim for compensation benefits was not allowed, and we reversed on appeal.

In the case before us, no family physician testified, and no doctor who testified saw Mrs. Casey before the day of the attack complained of. However, all of the doctors mentioned in this opinion personally observed Mrs. Casey; no one testified simply on the basis of having read the transcript. Of course, in the case cited, Dougan suffered his attack, and died before reaching the hospital; here, the weight of the evidence is to the effect that no heart damage was occasioned by the attack suffered on May 7.

As stated at the outset, we are only concerned with whether there was substantial evidence to support the finding of the commission. It is not within our province, irrespective of any sympathy that we might have for Mrs. Casey, to decide questions of fact. That is the function of the commission, and we are unable to say that the finding by the commission was not supported by substantial evidence.

Accordingly, the judgment of the Circuit Court is reversed, with directions to reinstate the order entered by the Workmen's Compensation Commission.

It is so ordered.

WARD, J., dissents.

PAUL WARD, Justice, dissenting. In dissenting to the majority opinion I shall try to make clear my views on two features of this case. *One* relates only to this particular case. *Two* relates to all cases of this nature.

*One.* While it is my opinion, after careful consideration, that there is no substantial evidence to support the findings of the Commission, I will endeavor to show

only that there is definitely a *doubt* about there being such evidence.

Set out below are my reasons for the *doubt*.

(a)   Before this case reached us five duly qualified judicial persons expressed their opinions on this matter. Two persons (two commissioners) thought there was no such evidence. Three persons (the referee, one commissioner, and the trial judge) thought there was such evidence.

(b)   It is undisputed: that appellee was a healthy woman before she began working on the assembly line, which entailed constant, tedious application and lifting heavy bundles; that, while working, she began suffering pains and finally completely collapsed; that shortly thereafter she tried the same work again and was unable to continue, and; that she is still unable to work although she needs to do so because of a sick husband and financial demands.

(c)   Dr. Ritchie testified, in essence, it was his opinion: that appellee was suffering from *angina pectoris;* that her condition was aggravated by her work, and; that she would never be able to return to the same type of work.

(d)   Ottenheimer's own doctor admitted: "the most reasonable assumption was that the attack was precipitated by the work she was doing". Again he said: "Well, I certainly would think that it would be aggravated by the type of lifting and the type of work she did".

To refute the above the majority rely on the testimony of one doctor whose opinion was that there was no relation between appellee's work and her attack or her present condition. Personally, I wonder if there was not some doubt in his mind since he used thirty three

pages in appellants' brief to express and substantiate is admitted that appellee's claim was not based on a "heart" condition or injury, the doctor referred to the "heart" at least twelve times. In his testimony the doctor said: "The angina pectoris is simply a *manifestation* of a disease", but Webster defines it as a "*disease*" —not a *manifestation.*

*Two.* If a *doubt* has been raised [and I cannot see how a reasonable person could say otherwise] then the *doubt* should have been resolved in favor of appellee.

In the case of *Cummings* v. *United Motor Exchange,* 236 Ark. 735, 368 S. W. 2d 82, where the Commission was reversed, we find this statement:

"... it is the intent and purpose of our Workmen's Compensation laws that they should be liberally construed and, that *doubtful* cases are to be resolved in favor of the claimant". (emphasis supplied.)

In the case of *Dougan* v. *Booker,* 241 Ark. 224, 407 S. W. 2d 369, we find the following language:

"The Workmen's Compensation Law was adopted to give compensation to workers, not to allow insurance carriers to make *fine distinctions* to avoid liability. In this case the Commission did not give the liberal interpretation to the law which our cases require." (emphasis supplied.)

In *Clemons* v. *Bearden Lumber Company,* 236 Ark. 636, 370 S. W. 2d 47, there is language which calls for serious and careful consideration in a case of this kind. It reads:

"The law imposes on us the *duty* to interpret the Workmen's Compensation Law liberally to the end

that the injured employees shall be remunerated for loss of earning power''. (emphasis supplied.)

In the spirit of the above holdings I would resolve the *doubt* in favor of appellee.